# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7757 | **DATE** | 2/6/2002 |
| **CASE TITLE** | Kurt Klaus vs. Builders Concrete | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Defendant's Motion for Summary Judgment [#21] is granted in part and denied in part. Status hearing set for 2/20/02 at 9:00 a.m. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 07 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 35 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/6/2002 | |
| | | | date mailed notice | |
| FT/*secy* | courtroom deputy's initials | | FT | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
02 FEB -6 PM 4: 37
FILED
Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KURT KLAUS,                        )
                                   )
    Plaintiff,  )  Case No.  00 C 7757
                                   )
    vs.         )  Magistrate Judge
                                   )  Arlander Keys
BUILDERS CONCRETE CO.,             )
                                   )
    Defendant.  )
                                   )

**DOCKETED**

**FEB 0 7 2002**

## MEMORANDUM OPINION AND ORDER

Defendant, Builders Concrete Co., moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  Defendant claims that Plaintiff, Kurt Klaus, has failed to raise a genuine issue of material fact in support of his claim that Defendant refused to rehire Plaintiff in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").  For the reasons set forth below, Defendant's Motion for Summary Judgment is Granted in part, and Denied in part.

### Factual Background

Builders Concrete is a family-owned construction company that employs more than 300 workers during its active season. Joanne and Walter Knoebel own the company, and their son, Tim Knoebel, is a company officer responsible for interacting with clients.

Plaintiff began working for Defendant as a truck driver in 1997. While Plaintiff was employed by Defendant, Howard Knoebel and Nick Macich were the Company's superintendents, and Cliff Skodi was Plaintiff's direct supervisor. Plaintiff's position was seasonal; like most of Defendant's construction workers, Plaintiff was laid off in the winter, when it was too cold to pour concrete, and was rehired in the spring. Defendant did not formally rehire its seasonal workers in the spring, but instead relied upon its employees to reappear for work when the weather improved.

Sometime in 1998, Plaintiff began experiencing pain in his legs. By the fall of 1999, Plaintiff's pain made it difficult for him to walk from Defendant's parking lot to his truck. Although Plaintiff attempted to de-emphasize his condition at work, downplaying his pain, at least a few of Plaintiff's coworkers noticed that Plaintiff was in visible pain. However, neither the Knoebels nor Cliff Skodi observed that Plaintiff was in severe pain or limped while walking.

In November, 1999, Plaintiff's physician, Dr. O'Brien, diagnosed Plaintiff with bilateral aortoiliac stenosis, with moderate lower arterial insufficiency bilaterally. Plaintiff's condition prevented adequate blood flow to his legs and buttocks. Dr. O'Brien advised Plaintiff that he had three options: 1) do nothing, and jeopardize his health; 2) attempt an aortogram; or

3) have bypass surgery. In November or December, 1999, Plaintiff informed Mr. Skodi about his decision to proceed with the aortogram, and, if necessary, the bypass surgery. Plaintiff explained that he scheduled the procedures for January, 2000, because he could not afford to miss a paycheck.

Consistent with prior years, Plaintiff was laid off on December 30, 1999. By this time, Defendant had laid off 90% of its seasonal workers. Defendant's only other driver, Tim Jackson, however, was not laid off until January 7, 2000. Plaintiff underwent his aortogram on January 2, 2000 -- three days after he was laid off from Builders' Concrete. The procedure was not successful in correcting Plaintiff's condition, and Plaintiff opted to proceed with the bypass surgery.

In mid-January, 2000, Plaintiff informed Mr. Skodi and Joanne Knoebel that he would have to undergo bypass surgery, and that he could not be "absolutely sure" about when he would return. Plaintiff underwent bypass surgery on February 1, 2000. The operation was a success and, contrary to his worst-case assessment of his recuperation, Plaintiff was ready to return to work in March.

Plaintiff contacted Mr. Skodi during the first week in March to inquire about returning to work. Mr. Skodi informed him that Defendant was very busy and could use help immediately. Plaintiff suggested that perhaps he should submit to Defendant a

letter from Dr. O'Brien certifying that he was fit to return to
work. On March 8, 2000, Dr. O'Brien drafted a letter confirming
that Plaintiff's operation was a success and that he could return
to work without restrictions. After Plaintiff presented Dr.
O'Brien's note to Defendant, however, Mr. Skodi explained that
Defendant's business was slow and that Plaintiff would not be
needed at that time.

Later that month, Tim Knoebel contacted Mr. Skodi to discuss
the possibility of Defendant purchasing another truck. When Mr.
Skodi suggested that Plaintiff could drive the truck, if
purchased, Mr. Knoebel responded that Defendant was not going to
rehire Plaintiff because of his repeated tardiness. Despite
Plaintiff's repeated calls about being returned to work, Cliff
Skodi never relayed this information to Plaintiff.

Plaintiff does not dispute that he was late for work on a
few occasions, but notes that he was never reprimanded about his
performance or informed that he might lose his job. Although
some of Defendant's workers claim that Plaintiff was excessively
tardy and a slow driver, many of Defendant's foremen and
employees did not have a problem with Plaintiff's work
performance.

Plaintiff repeatedly contacted the Knoebels in March and
April of 2000 about returning to work, but they refused to accept
his calls. Plaintiff realized that he would not be rehired when

4

he observed a new employee driving his truck. Shortly
thereafter, Plaintiff filed a claim with the Equal Employment
Opportunity Commission ("EEOC"), alleging discrimination under
the FMLA and the ADA. On September 20, 2000, the EEOC issued
Plaintiff a Right To Sue letter, finding reasonable cause to
believe that Plaintiff's charges of discrimination were true.
Plaintiff filed this lawsuit within 90 days of receiving that
letter.

## Discussion

Plaintiff contends that Defendant's decision not to rehire
him in the Spring of 2000 violated the FMLA and the ADA. Before
addressing these claims, the Court sets forth the standards that
guide its inquiry.

## I. Standards Governing Motions for Summary Judgment

The Federal Rules of Civil Procedure endorse motions for
summary judgment "if the pleadings, depositions, answers to
interrogatories and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986). When confronted with a motion
for summary judgment, the nonmovant may not rest upon its
pleadings, but must present specific facts demonstrating that a
genuine issue for trial exists. *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986). This requires the party opposing summary judgment to do more than show that "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Summary judgment must be denied if the parties dispute facts that, under governing law, might affect the result of the litigation. *Anderson,* 477 U.S. at 248.

The Court construes all facts and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party when ruling on a motion for summary judgment. *Matsushita,* 475 U.S. at 587. Furthermore, it is the jury, not the court, that determines credibility, weighs evidence, and draws all reasonable inferences from the facts. *Anderson,* 477 U.S. at 255. Since credibility and intent are pivotal issues in the case *sub judice*, as in most employment discrimination cases, this standard is applied with added rigor to the present facts. *Schmidt v. Methodist Hosp. of Ind., Inc.,* 89 F.3d 342, 344 (7th Cir. 1996).

## II. Plaintiff Is Not Entitled To Protection Under the FMLA

Plaintiff first claims that Defendant violated the FMLA when it refused to rehire him. The FMLA "establishes two categories of broad protections for employees."[1] *King v.*

---

[1]  The FMLA also requires employers to inform employees of their rights and obligations under the FMLA. 29 C.F.R. § 825.301(a) -(c). "An employer's failure to give adequate notice concerning an employee's rights and obligations under the FMLA may amount to interference with the employee's FMLA rights if such failure causes the employee to forfeit his FMLA protection."

6

*Preferred Tech. Growth,* 166 F.3d 887, 891 (7th Cir. 1999).
First, the FMLA entitles employees of a covered employer to
unpaid leave for up to 12 work weeks in a twelve month period for
a "serious health condition". 29 U.S. C. § 2612(a)(1) (West
2001). Following FMLA leave, the employee is entitled to be
reinstated to his former position, or a substantially similar
position. 29 U.S. C § 2614(a) (West 2001). The FMLA prohibits
employers from interfering with, restraining, or denying the
exercise of these rights. 29 U.S.C. § 2615(a)(1) (West 2001).

Next, the FMLA provides redress in the event an employer
discriminates against an employee for exercising his rights under
the FMLA. *King,* 166 F.3d at 891. "In contrast to what an
employee must show to establish a deprivation of a substantive
guarantee under the Act, when an employee raises the issue of
whether the employer discriminated against an employee by taking
adverse action against the employee for having exercised an FMLA
right, the question of intent is relevant." *King,* 166 F.3d at
891.

Plaintiff concedes that, in order to establish an FMLA
claim, he must demonstrate the following: 1) his employer is

*Biermann v. Alumninum Co. of America,* No. 3-98-CV-20159, 2000 WL
33362002, at *6 (S.D. Iowa Jan. 21, 2000). Plaintiff does not
allege that Defendant's failure to provide him with notice of his
rights under the FMLA caused him to forfeit FMLA protection by
delaying his surgery until the lay-off season. To the contrary,
Plaintiff testified that he scheduled his surgery for the lay-off
season because he did not want to miss a paycheck.

covered by the FMLA; 2) he was "eligible" for FMLA's protections;
3) he had a "serious health condition" within the meaning of the
FMLA that required him to have time off from work; and
4)Defendant refused to rehire him because he took FMLA leave.
See Pl.'s Br. at 5 (citing *King*, 166 F.3d 887.)  Plaintiff's FMLA
claim falls short, however, because: 1) he cannot establish that
his allegedly serious health condition required him to have time
off from work; and 2) he never requested or required FMLA leave.

Plaintiff was laid off on December 30, 1999.
Plaintiff's aortogram was performed on January 2, 2000.  The
procedure was not successful in correcting Plaintiff's condition,
and Plaintiff required bypass surgery, which was performed on
February 1, 2000.  Both of these procedures took place after
Plaintiff was laid off.  Therefore, Plaintiff's health condition
did not require Plaintiff to take FMLA leave or any other type of
leave.

Plaintiff insinuates that the timing of his lay off was
discriminatory.  Plaintiff claims that, even though the 1999-2000
lay-off season did not begin until the second week in January of
2000, Mr. Skodi put Plaintiff on "special early lay off" on
December 30, 1999, to avoid providing Plaintiff with FMLA leave
for his impending aortogram, scheduled for January 2, 2000.

The Court discerns nothing sinister about the timing of
Plaintiff's lay off, and finds that Plaintiff's self-serving

hearsay testimony that Mr. Skodi placed him on "special early lay off" is belied by his own evidence. For example, Plaintiff concedes that he informed Mr. Skodi that he intentionally scheduled these procedures during the lay-off season, because he did not want to miss a paycheck.

Plaintiff also directs the Court's attention to an unauthenticated business record allegedly documenting the 1999 lay-off schedule, which Plaintiff claims demonstrates that he was laid off early, presumably for discriminatory reasons.[2] But the schedule does not say what Plaintiff claims it does. According to this schedule, the lay-off season did <u>not</u> begin in mid-January, as Plaintiff alleges, but in November of 1999. The document further indicates that Defendant had already laid off 90% of its seasonal workers by the time Defendant laid off Plaintiff on December 30, 1999.

Tim Jackson, Defendant's only other truck driver, was laid off one week after Plaintiff, on January 7, 2000 – four days after Plaintiff's aortogram, but weeks before his bypass surgery. The fact that Mr. Jackson was laid off one week after Plaintiff,

---

[2] Defendant objects to Plaintiff's reliance upon Defendant's alleged 1999-2000 lay-off schedule because it is unauthenticated and, therefore, inadmissible hearsay. *United States v. Lawrence*, 934 F.2d 868, 870-71 (7th Cir. 1991) (without corroborative testimony from a qualified witness that this document was really a business record, kept in the regular course of business, the fact that the document may have been produced during discovery does not, alone, authenticate it.)

standing alone, does not create an inference that Defendant laid off Plaintiff to avoid providing Plaintiff with a few days of unpaid FMLA leave.[3]   Notably, all seasonal employees had been laid off by the time Plaintiff underwent bypass surgery on February 1, 2000.

The Court further finds that Plaintiff did not <u>request</u> FMLA leave.  Prior to Plaintiff's lay off, Plaintiff informed Mr. Skodi that he would likely undergo an aortogram and possibly by-pass surgery in January, 2000.  However, the Court finds that merely informing Mr. Skodi that Plaintiff <u>might</u> require certain medical procedures – which would be performed at a time when Plaintiff was not even employed by Defendant – is not a request for FMLA leave.  The evidence does not demonstrate that Plaintiff informed Defendant that it was foreseeable that he would require leave prior to his lay off.

Similarly, the Court finds that Plaintiff's decision to tell Mr. Skodi and Ms. Knoebel in January that he would undergo bypass surgery later that month does not trigger the protection under the FMLA either.  Although Plaintiff informed Mr. Skodi and Ms. Knoebel that he could not be "absolutely sure" that he would be able to return to work at the end of the lay-off season, this proved not to be the case.

---

[3] Plaintiff's physician, Dr. O'Brien, testified that an aortogram is an outpatient procedure that does not require a hospital stay. O'Brien Dep. at 20.

What distinguishes the instant case from cases where an employee was terminated after informing his employer that he intended to take FMLA leave in the future, *Compare Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001) (noting that FMLA is triggered by request for foreseeable leave), is the fact that Plaintiff confirmed that he would not require such leave prior to Defendant's adverse job action.  Plaintiff was ready, willing, and able to return to work when Defendant began rehiring its seasonal workers in the Spring of 2000, and he presented to Defendant a doctor's note certifying that this was the case.  Plaintiff has not cited, nor has the Court located, any authority that the FMLA protects an employee who informs his employer that he <u>might</u> require time off work to recuperate from a potential surgery, subsequently discovers that he does not require such leave and informs his employer of this, and then suffers an adverse job action.

Congress enacted the FMLA "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S. C. § 2601(a).  Plaintiff was able to address his medical condition without taking leave; he scheduled his medical procedures to coincide with Defendant's lay-off season.  In addition, while the FMLA protects employees from retaliation for requesting medical leave, the Court finds that an employee is not covered by the

FMLA when the employee informs his employer that, due to a medical condition, he could not be "absolutely sure" that he would return to work on time, but subsequently does. Because Plaintiff neither required nor requested FMLA leave, the Court finds that Plaintiff has failed to demonstrate that the FMLA is implicated at all, and Defendant's Motion for Summary Judgment with respect to Plaintiff's FMLA claims is granted.

### III. Plaintiff Has Raised a Genuine Issue Of Material Fact As To Whether Defendant Regarded Him As Disabled Under the ADA.

Having determined that Plaintiff cannot recover under the FMLA, the Court turns to Plaintiff's ADA claim. In order to establish a *prima facie* case under the ADA, a plaintiff must show that: (1) he is "disabled" for purposes of the ADA; (2) he is "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"; and (3) the employer took an adverse employment action against him because of his disability, or failed to make a reasonable accommodation. *Stevens v. Illinois Dept. of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000), *cert. denied*, 121 S. Ct. 1187 (2001). Implicit in this analysis is that the employer was aware of the disability at the time of the adverse employment action. *See Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999).

Under the ADA, an individual is "disabled" if he (A) has a physical or mental impairment that substantially limits one or

12

more of the individual's major life activities;[4] (B) has a record of such an impairment; or (C) is regarded as having such an impairment. 2 U.S.C. 12102(2). It is not the Court's role to determine whether Plaintiff was, in fact, "disabled" under the ADA; rather, the Court only needs to decide whether a rational jury, viewing the evidence in the light most favorable to Plaintiff, could reach such a conclusion. *EEOC v. Sears, Roebuck and Co.*, 233 F.3d 432, 438 (7th Cir. 2000).

Once a plaintiff establishes, by a preponderance of the evidence, a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). In order to stave off summary judgment, the plaintiff must show that the defendant's articulated reason is phony ("pretextual"). *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178-79 (7th Cir. 1997); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2102 (2000)("a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")

---

[4] "Major life activities" are defined as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i) (West 2001).

The ADA does not protect all medically-afflicted persons; rather, it protects only employees who are discriminated against by their employer because they are, in fact, disabled, or perceived to be disabled. *Christian v. St. Anthony Med. Ctr., Inc.,* 117 F.3d 1051, 1053 (7th Cir. 1997). Consequently, an employer does not violate the Act by discriminating against an employee on the basis "of their being (or being believed by him to be) ill, even permanently ill, but not disabled." *Id.* Depending on the circumstances, "[s]ome impairments may be disabling for particular individuals but not for others." *Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 952 (7th Cir. 2000)(citation omitted).

Plaintiff argues that he is "disabled" under the ADA both because he had a serious impairment that substantially limited a major life activity, and because the Defendant perceived him to be disabled.[5] The Court addresses each argument in turn.

---

[5] Although Plaintiff's Complaint does not expressly allege that he suffered from a severe physical impairment that substantially limited a major life activity, the Court finds that, under the Federal Rules of Civil Procedure's liberal notice-pleading standard, the claim is properly before the Court. Moreover, Defendant was apparently aware that it was defending against such a claim, as it devoted considerable effort to arguing in its Motion for Summary Judgment that Plaintiff did not have an impairment that substantially limited a major life activity. Conversely, even though Plaintiff's Complaint does allege that he had a record of disability, Plaintiff abandons this claim in his response brief.

## 1. **Plaintiff Did Not Have a Severe Impairment That Substantially Limited A Major Life Activity.**

The Supreme Court instructs the Court to assess whether a particular condition constitutes a disability by following a three-step inquiry. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). First, the Court must determine if Plaintiff's condition is a physical or mental impairment. *Id.* Second, the Court must identify an affected life activity upon which Plaintiff relies, and determine whether it constitutes a major life activity under the ADA. *Id.* Third, the Court must ask whether the impairment substantially limited a major life activity. *Id.*

To satisfy the first step of this inquiry, the Court looks to 29 C.F.R. § 1630.2(h)(1), which defines a "physical impairment" as "[a]ny physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following bodily systems: . . . respiratory." Because Plaintiff's condition adversely affects his ability to walk, it undoubtedly qualifies as a "physical impairment."

Turning to the second step, Plaintiff argues that he is disabled because, at least prior to his surgery, he was substantially limited in the major life activity of walking. This activity constitutes a "major life activity" for purposes of the ADA. *See, e.g.,* 29 C.F.R. § 1630.2(i) (stating that breathing, walking and working are major life activities);

*E.E.O.C. v. Sears, Roebuck & Co.,* 233 F.3d 432, 438 (7th Cir.
2000) (finding that walking is a major life activity).

Finally, Plaintiff insists that his impairment was so severe
that it "substantially limited" his ability to walk. The term
"substantially limits" means that Plaintiff is either unable to
perform, or significantly restricted as to the condition, manner,
or duration under which he can walk, as compared to an average
person in the general population. 29 C.F.R. § 1630.2(j)(1)(ii).
The Supreme Court instructs that "[l]ooking at the Act as a
whole, it is apparent that if a person is taking measures to
correct for, or mitigate, a physical or mental impairment, the
effects of those measures — both positive and negative — must be
taken into account when judging whether that person is
'substantially limited' in a major life activity and thus
'disabled' under the Act." *Sutton v. United Air Lines, Inc.,* 527
U.S. 471, 482 (1999).

The Court finds that, at the time Defendant declined to
rehire Plaintiff, Plaintiff's ability to walk was not
substantially limited. *Bay v. Cassens Transport Co.,* 212 F.3d
969, 974 (7th Cir. 2000) ("Whether or not an individual meets the
definition of a qualified individual with a disability is to be
determined as of the time the employment decision was made.")
There is simply no evidence in the record that, at least
following Plaintiff's surgery, Plaintiff experienced such

difficulty walking, that he was restricted as compared to the average person in the general population.

On March 8, 2000, Plaintiff's physician, Dr. O'Brien, confirmed that Plaintiff's operation was a success and that he could return to work with no restrictions. The Court rejects Plaintiff's suggestion that he might have been disabled following his surgery, despite his doctor's assessment that Plaintiff was "doing well," "had no residual indications of problems," and was free to "return to work with no restrictions." *See* O'Brien 3/8/00 letter. While it may be possible that Plaintiff was disabled following his surgery – just as almost anything is possible -- there is no evidence to suggest that Plaintiff actually had severe difficulty walking after his surgery, and there is no evidence in the record calling into question the veracity of Dr. O'Brien's assessment of Plaintiff's condition. On the contrary, Plaintiff actually admits that, as of March 2000, he was not substantially limited with respect to his ability to walk. *See* Pl.'s Rule 56.1 Resp., ¶ 65.

In the alternative, Plaintiff argues that, even if the Court were to find that Plaintiff was not disabled following his surgery, the evidence is not conclusive as to <u>when</u> the Defendant allegedly discriminated against Plaintiff. *Ergo*, Plaintiff argues, Defendant may have discriminated against Plaintiff at a time when Plaintiff was disabled. The Court has already

determined, *supra*, that Defendant did not discriminate against Plaintiff when it laid him off on December 30, 1999.

Similarly, Plaintiff's assertion that Defendant may have made the decision not to rehire him sometime in February, 2000 is pure speculation, unsupported by the record evidence.[6] Even if the decision was made in February, 2000, however, Plaintiff still has not produced evidence that he was disabled following his surgery on February 1, 2000. The evidence demonstrates that Tim Knoebel made the decision not to rehire Plaintiff in March or April of 2000. This is entirely consistent with Plaintiff's own admission that, when he initially contacted Defendant in March, Mr. Skodi told him he could return to work, and that it was only after Plaintiff presented the release from Dr. O'Brien that Defendant refused to rehire him. While Plaintiff asks the Court to infer that Defendant's reaction to his physician's release is suspicious, suspicious conduct is irrelevant under the ADA unless Plaintiff is disabled.

Because the Court finds that Plaintiff's walking was not substantially limited when Defendant declined to rehire him, Plaintiff cannot demonstrate that he was physically disabled

---

[6] Plaintiff's reliance on Howard Knoebel's alleged statement that Defendant would not rehire Plaintiff because he was "screwed up" is misplaced-- at least with respect to his argument that the decision not to rehire him was made before his surgery. Plaintiff testified at his deposition that, as far as Plaintiff knew, this statement was made in March, not February.

18

under the ADA. If Plaintiff's ADA claim is to succeed at all, Plaintiff must establish disability under the "regarded as" prong of the ADA's definition of disability to survive summary judgment.

### 2. Defendant May Have Regarded Plaintiff as Disabled

In addition to protecting qualified individuals with substantially limiting conditions, the ADA also protects persons from discrimination by employers that regard them as disabled. *Sutton v. United Airlines*, 527 U.S. 471, 489 (1999). Congress enacted the "regarded as" provisions of the ADA to combat the effects of archaic attitudes and erroneous perceptions that employers may harbor about impairments that are not, in and of themselves, substantially limiting. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir. 1995).

The Supreme Court has identified two ways that an employer may unlawfully regard an employee as disabled.[7] First, the employer may mistakenly believe that the employee has a physical impairment that substantially limits a major life activity, when the employee has no impairment at all. *Sutton*, 527 U.S at 471. The second way that an employer violates the "regarded as" provisions of the ADA is when the employer correctly perceives

---

[7] The ADA regulations actually recognize a third way, noting that an employer may discriminate against an employee who has an impairment that is substantially limiting, but only because of the attitudes of others. 29 C.F.R. § 1630.2(l).

the employee to have an impairment, but erroneously believes the impairment to be more limiting than it actually is. *Id.*

The Court explained that, in both cases, the employer's misperception results from "stereotypic assumptions not truly indicative of . . . individual ability." *Id.* Under the ADA's "regarded as" definition of disabled, it is not enough to show that an employer regarded an employee as impaired; the employee must show that the employer regarded him as disabled within the meaning of the ADA. *See Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998).

In support of his claim that Defendant regarded him as disabled, Plaintiff claims that Howard Knoebel told Cliff Skodi that Plaintiff was not being returned to work in the Spring of 2000 because Plaintiff was physically "all screwed up." When Plaintiff asked Cliff Skodi why he was not being returned to work, Mr. Skodi allegedly offered Howard Knoebel's remarks as the explanation, and assured Plaintiff that he (Cliff Skodi) told Howard Knoebel that this was not the case, and that Plaintiff had recovered from his surgery. Plaintiff cites to his own deposition testimony and Cliff Skodi's deposition testimony in support of his claim that such statements were made. Defendant correctly notes, however, that Mr. Skodi testified that he does not recall such a statement being made. Defendant then attacks Plaintiff's reliance upon his own testimony as inadmissible

double hearsay, insufficient to defeat its motion for summary judgment. The Court disagrees.

Both Howard Knoebel's statement to Cliff Skodi, and Cliff Skodi's statement to Plaintiff are admissible as admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2)(D) (statements made by an agent or servant that are against the employer's interest and that concern matters within the scope of employment are not hearsay). Because both components of the statement satisfy Rule 801(d)(2)(D), the evidence is not impermissible double hearsay. *See* Fed. R. Evid. 805; *EEOC v. HBE Corp.,* 135 F.3d 543 (8th Cir. 1998)(employees' testimony that their supervisors told them that the hotel's manager made racist comments was admissible as admissions against interest).

The question then becomes whether this admission is sufficient evidence that Defendant regarded Plaintiff as disabled. By the narrowest of threads, the Court finds that the statement gives rise to an inference that Defendant may have refused to rehire Plaintiff because it regarded him as disabled.

The Court acknowledges that the evidence is underwhelming. The first roadblock to Plaintiff's case is the fact that Howard Knoebel denies making such a statement, and Cliff Skodi has no recollection of such a statement ever being made.[8] Assessing

---

[8] Notably, Cliff Skodi admitted that, while he could not recall such a statement being made, it was not impossible that this conversation took place.

credibility, however, is a traditional function of the jury and it would be inappropriate for the Court to stand in its stead in this regard.

More troubling, however, is the tenuous link between Howard Knoebel's statement and any real assessment of Plaintiff's physical condition. If accepted, the statement reveals little insight into Defendant's evaluation of Plaintiff's ability to walk and/or work. Nevertheless, drawing all inferences in Plaintiff's favor, as the Court must, the statement could be indicative of Defendant's belief that Plaintiff was not up to par physically, and, perhaps, was substantially limited with regard to his ability to walk and/or work when compared with the general population. At the very least, accepting the statement as true, it is arguable that Defendant did not want to rehire Plaintiff because of his physical condition. Whether Defendant considered that condition to be substantially limiting, or merely a nuisance, is not a question for this Court to decide. Because such a determination is properly within the province of the jury, the Court finds that this evidence prevents it from entering summary judgment on Plaintiff's "regarded as" ADA claim.

**3. Plaintiff Has Raised a Genuine Issue As To Causation**

It is not sufficient for Plaintiff merely to establish that Defendant regarded him as disabled; Plaintiff also must present evidence giving rise to an inference of a causal connection

22

between his perceived disability and the decision not to rehire him. *Skorup v. Modern Door Corp.*, 153 F.3d 512,515 (7th Cir. 1998). Plaintiff attempts to establish a causal connection between his perceived disability and Defendant's decision not to rehire him by pointing to discriminatory comments and suspicious timing. *Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1136 (7th Cir. 1997).

Focusing first upon the allegedly discriminatory remarks, Plaintiff directs the Court to Tim Jackson's deposition testimony, admitting that Mr. Jackson thought that Plaintiff was "slow," and that he and many other workers referred to Plaintiff as "turtle." Plaintiff's reliance upon Mr. Jackson's testimony is disingenuous; Plaintiff takes Mr. Jackson's testimony out of context. Mr. Jackson clearly states that he did not think that Plaintiff had any difficulty walking, or that Plaintiff walked slowly. Mr. Jackson explained that Plaintiff earned the nickname "turtle" because Plaintiff worked slowly, and took an excessive amount of time driving from one jobsite to another. Jackson Dep. at pp. 24-25.

Similarly, Plaintiff's allegation that Cliff Skodi called him grandpa on a few occasions is not evidence that Defendant refused to rehire Plaintiff because he was regarded as disabled. The Seventh Circuit has explained that isolated remarks remote in time or context are insufficient to establish a causal connection

between such remarks and the adverse job action.  *Uhl*, 1212 F.3d at 1136.

Plaintiff fares better with his argument that, because he was not rehired shortly after he had bypass surgery, the timing suggests that the actual reason Defendant refused to rehire him was because it believed Plaintiff was disabled.  "Suspicious timing is plausible when events occur over weeks or months." *Uhl*, 121 F.3d at 1136.  The close temporal proximity between Plaintiff's surgery and the Defendant's decision not to rehire Plaintiff raises an inference that the decision was causally connected to Plaintiff's surgery.  This evidence, particularly when viewed in conjunction with Howard Knoebel's alleged admission that Plaintiff was not being rehired because he was physically "all screwed up," is sufficient to establish a causal connection between Defendant's misperception of Plaintiff as disabled and the adverse job action.

### 4. Whether Defendant's Reason For Not Rehiring Plaintiff is Pretextual is a Question For the Jury.[9]

---

[9] Defendant does not rely upon Plaintiff's alleged performance problems in arguing that Plaintiff has failed to establish a prima facie case under the ADA.  Rather, Defendant relies upon this evidence in support of its business justification for not rehiring Plaintiff.  This is consistent with the view of many courts that evidence regarding an employee's subjective qualifications is properly introduced on rebuttal.  *See EEOC v. Town & Country Toyota, Inc.,* No. 00-2167, 2001 WL 369675, at *2 (4th Cir. April 13, 2001); *EEOC v. Horizon/ CMS Healthcare Corp.,* 220 F.3d 1184, 1192-94 (10th Cir. 2000) ("subjective qualifications . . . are more properly considered at the second stage of the *McDonnell Douglas* analysis).

Having determined that Plaintiff has made his prima facie case on his "regarded as" disabled theory, the Court turns to Defendant's proffered reason for not rehiring Plaintiff, and Plaintiff's claim that Defendant's alleged business justification for not rehiring him is a mere pretext for disability discrimination.

Defendant contends that, in March or April of 2000, Tim Knoebel[10] decided not to rehire Plaintiff because of performance problems; particularly, Plaintiff's excessive tardiness. Plaintiff disputes that his alleged performance problems warranted termination, and highlights Defendant's conflicting evidence as to who was responsible for the decision not to rehire Plaintiff. Plaintiff also relies heavily upon the declarations of various coworkers and foremen who contend that Plaintiff was performing up to par, and on the fact that Cliff Skodi was willing to rehire Plaintiff in the Spring of 2000[11], in support of

---

[10] Defendant contends that it could not have regarded Plaintiff as disabled because Tim Knoebel, who made the decision not to rehire Plaintiff, was not even aware of Plaintiff's surgery until long after the decision was made. Defendant contends that only Tim Knoebel's mother, Joanne Knoebel, and Cliff Skodi were aware of Plaintiff's surgery. Howard Knoebel's statement, however, gives rise to the inference that Defendant refused to rehire Plaintiff because of his disability, and not because Tim Knoebel believed Plaintiff was excessively tardy.

[11] Specifically, Mr. Skodi testified that, when Plaintiff called about returning to work, Mr. Skodi responded that "I could use you right now because . . . we can't carry the work load. But I could use you, your wife, your kids and a wheelbarrow.

his claim that the Defendant's proffered business justification is a mere pretext for discrimination.

In order to resolve this dispute, the Court need not discuss each piece of conflicting evidence regarding Plaintiff's performance and whether Defendant had a policy of progressive discipline. Instead, the Court focuses upon the testimony of Tim Knoebel, who contends that he was the person responsible for the decision not to rehire Plaintiff.

At his deposition, Tim Knoebel first testified that he played no role in the decision to terminate Plaintiff, but shortly thereafter conceded that the decision not to rehire Plaintiff was exclusively his own. Defendant's attorney resuscitates this apparent contradiction by noting that Defendant never made the decision to terminate Plaintiff, but only not to rehire him. Given the importance Defendant places upon this distinction throughout its filings, the explanation is plausible.

Less plausible, however, is Mr. Knoebel's explanation for why he decided not to rehire Plaintiff. Mr. Knoebel claims that, without consulting anyone, he decided not to rehire Plaintiff because Plaintiff was often tardy, stating that he did not want

---

Anybody we can get to try and get the work done. " Skodi Dep. at p. 91. While Mr. Skodi's statement indicates that Defendant was so busy that he was not being selective in recalling workers, the evidence still gives rise to the inference that Mr. Skodi did not view Plaintiff's alleged performance problems as a roadblock to his rehire.

to have anyone working for him who did not show up on time. As an example of Plaintiff's tardiness, Mr. Knoebel pointed to an incident where Mr. Knoebel was waiting at a jobsite for Plaintiff to deliver stone. Plaintiff was late and Mr. Knoebel was angry, but ultimately forgiving. When Plaintiff allegedly operated his truck in an unsafe manner two days later, however, Mr. Knoebel claims his "blood pressure went through the roof." Mr. Knoebel explained that Defendant's drivers are expected to inspect their trucks at the beginning of each day to ensure that they are in proper working order. Failure to do so could jeopardize the safety of the driver and others. So, when an axle fell from Plaintiff's truck, it was apparent to Mr. Knoebel that Plaintiff had not taken the time to inspect his vehicle – presumably because he was late once again. Notably, at the time of his deposition, Mr. Knoebel could not recall when these incidents occurred.

Although there is evidence in the record that some superintendents might not terminate a worker under such circumstances, the Court agrees that this alone is insufficient evidence of pretext. What does cast sufficient doubt on the credence of Mr. Knoebel's explanation, however, is the timing of these events and the decision not to rehire Plaintiff. These incidents occurred in 1998 and, yet, Defendant saw fit to rehire Plaintiff in 1999. If these incidents were so significant as to

27

warrant termination, it is incredible that Defendant would rehire Plaintiff in 1999, but then fail to bring him back one year later on the basis of these events.

The Court acknowledges that Mr. Knoebel did not say that these incidents were the only reason he did not rehire Plaintiff. He did testify, however, that he did not speak with anyone about not rehiring Plaintiff, that the decision not to rehire Plaintiff was his alone, and he fails to describe any other interaction with Plaintiff that might justify his claim that Plaintiff's tardiness warranted the failure to hire him.

Moreover, Defendant offers little evidence that is contemporaneous with Plaintiff's employment to demonstrate that Plaintiff's performance was inadequate. Instead, Defendant relies heavily upon declarations and deposition testimony, which were prepared long after the decision not to rehire Plaintiff was made. *See Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998) (reversing summary judgment where "[a]ll of the evidence supporting the employer's proffered reasons came from statements, depositions, and declarations prepared after the employment decision was made and while this litigation was in progress.")

Defendant's own conflicting evidence as to who was responsible for not rehiring Plaintiff – and employees in general -- muddies the waters even further. Joanne Knoebel testified

that Cliff Skodi would have been responsible for making the decision, but Cliff Skodi stated that only the superintendents – Howard Knoebel and Nick Macich - have such authority. No one identified Tim Knoebel as even a *potential* decisionmaker. And Defendant does not explain why Tim Knoebel, who is normally responsible for interacting with clients, made the business decision not to rehire Plaintiff – with whom he had little interaction, absent an incident that might trigger an immediate termination.

Viewed on their own, these minor inconsistencies might not give rise to an inference that Defendant's business justification for not rehiring Plaintiff was merely a pretext for disability discrimination. However, when this evidence is combined with Howard Knoebel's statement that Defendant was not bringing Plaintiff back because he was physically all screwed up, an inferences of pretext arises. *Reeves*, 530 U.S. at 147 (quoting *St. Mary's*, 509 U.S. at 511). The fact that Howard Knoebel made such a statement alone sheds doubt upon Defendant's business justification for not rehiring Plaintiff. Therefore, the Court finds that Plaintiff has produced enough evidence to survive summary judgment.

## CONCLUSION

For the foregoing reasons, the Court finds that there are genuine issues of material fact in dispute regarding whether

Builders Concrete regarded Mr. Klaus as disabled, whether it refused to rehire Plaintiff because of this misperception, and whether its proffered reason for not rehiring Plaintiff was a mere pretext for discriminatory animus. Although the evidence giving rise to these issues of fact is not strong, it nevertheless prevents the Court from entering summary judgment on Plaintiff's "regarded as" claim under the ADA.

The Court finds, however, that Mr. Klaus' claims that the Defendant violated the FMLA or discriminated against him because his ability to walk was substantially limited when compared with the general population are dismissed as a matter of law.

**IT IS THEREFORE ORDERED** that:

Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED IN PART**, and **DENIED IN PART**.

FEBRUARY 6, 2002                    ENTER:

ARLANDER KEYS
United States Magistrate Judge